```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
IN RE: FOSAMAX PRODUCTS LIABILITY   :
LITIGATION 1:06-MD-1789-JFK         :     06 Civ. 09455 (JFK)
-----------------------------------X
This Document Relates to:           :
                                    :     OPINION and ORDER
Shirley Boles v. Merck & Co., Inc.  :
Case No. 1:06-cv-09455-JFK          :
-----------------------------------X
```

**JOHN F. KEENAN, United States District Judge:**

## Background

On July 7, 2010, Gary Douglas, Esq., of Douglas & London, P.C., 111 John Street, 14th Floor, New York, New York 10038, who was trial counsel for Shirley Boles in this case, was **ORDERED TO SHOW CAUSE** as to why he should not be sanctioned under the inherent power of the Court to conduct its business and affairs fairly and without improper behavior by counsel and why his conduct should not be referred to the Grievance Committee of this Court.

The matter was heard on September 9, 2010 and Mr. Douglas, through his counsel, argued that he should neither be sanctioned nor should his conduct be referred to the Grievance Committee of the United States District Court for the Southern District of New York.

Mr. Douglas has submitted a declaration in response to the Order To Show Cause on August 16, 2010, together with several exhibits supporting his opposition.  They include a declaration

on his behalf from Richard Godosky, Esq., a letter from his co-counsel, Joyce London, Esq., a declaration by Timothy M. O'Brien, Esq., letters from some fourteen lawyers who know Mr. Douglas personally and professionally, and various other documents and submissions.

The Order To Show Cause cites nine separate areas where the Court directed Mr. Douglas to explain "why he should not be sanctioned and/or referred to the Grievance Committee." They are essentially as follows:

> (1) "referencing the trial of Maley v. Merck, 06 Civ. 04110 (JFK) before the jury (Trial Tr. at 984:13-986:10) despite explicit instructions not to make reference to other cases in this multi-district litigation (Id. at 230:2-11; Aug. 11, 2009 Tr. at 83)";
>
> (2) "misstating during summation the date of the 'Mucci Report'";
>
> (3) "attacking the FDA during summation for the manner in which it is funded" and characterizing the FDA "as having an 'incestuous' relationship with pharmaceutical companies";
>
> (4) "criticizing the ability of the FDA to regulate drug safety without a proper foundation in evidence," comparing it "to the Government's response to Hurricane Katrina";
>
> (5) "injecting the issue of punitive damages into the trial - despite the fact that the Court had already dismissed the punitive aspect of the case on summary judgment - by arguing that Plaintiff should receive a damages award 'to say something to Merck' (Aug. 5, 2009 Op. & Order at 41; Trial Tr. at 1664:3-7, 1674:8-10, 1678:7-11, 1683-84,

>   1704:10-13, 1710-11)";
>
>   (6) "improperly injecting his own opinion concerning the evidence into his summation";
>
>   (7) "improperly making reference to adverse event reports";
>
>   (8) "using a demonstrative containing the single word 'hypocrisy' in describing the conduct of the defendant and defense counsel";
>
>   (9) "repeatedly disparaging defense witnesses and generally acting rudely to defense counsel . . . using sarcasm, gestures, imitations, mockery, singing, derogatory tones, laughing . . . 'fooling around' and 'making fun' (E.g., id. at 1668:1-1669:1-2, 1677:13-21, 1714:7-9)".

## Discussion

This case is one of several bellwether cases in this multi-district litigation which now consists of over 800 different lawsuits by individual plaintiffs filed against Merck. The trial of this case commenced on June 8, 2010 and ended with a jury verdict for the plaintiff on June 23, 2010. Timothy M. O'Brien, Esq., Pensacola, Florida, and Mr. Douglas were the principal counsel for the plaintiff during the trial. A previous trial of the case ("Boles I"), which was held in August-September, 2009, resulted in a hung jury.

This second Boles trial was an unusually confrontational and hard-fought case in which emotions were plainly visible on both sides. The papers submitted by

Mr. Douglas demonstrate that he is an experienced trial lawyer and has tried at least fifty cases "to full verdict." He believes that while his "style may, at times, be demonstrative or dramatic, it is effective and within the bounds of the law and accepted advocacy." (Douglas Decl. ¶ 8.)

In response to Point 1 above, the Douglas Declaration disingenuously states:

> I believed that in this re-trial of the <u>Boles</u> case, the Court did not want any party to refer to the fact that there had been <u>a first and prior trial involving the same parties, Shirley Boles and Merck</u>. Nor is there any mention of any cases other than the <u>Boles</u> case in the ruling cited by the Court.

(Douglas Decl. ¶ 29.) (emphasis in original)

In a letter on this subject which the Court received on September 21, 2010, his counsel, Michael S. Ross, Esq., urged that Mr. Douglas "simply did not have notice" that there was a prohibition against reference to other Fosamax cases by name. (Sept. 20, 2010 Letter from Michael S. Ross at 4-5.)

In his declaration, Mr. Douglas states twice that he had no "actual notice" of a directive by the Court not to mention or refer to other cases in this multi-district litigation. (Douglas Decl. ¶ 31.) However, Mr. O'Brien's declaration states that Mr. Douglas read the entire transcript of the record in

Boles I. (O'Brien Decl. ¶ 4.) If so, he did have actual notice of my ruling relating to not making reference to other matters in this MDL Docket.

During the trial of Boles I, the Court warned counsel that the jury should not be made aware of the fact that plaintiff's claim is but one of hundreds comprising this multi-district litigation. As the Court then explained, the case "involves one plaintiff and one defendant" and so the "jury has no business knowing whether there's an MDL" because "the fact there are a lot of other cases brought could very understandably inure to the detriment of the defendant." (Aug. 13, 2009 Tr. at 273-274).

At the outset of Boles II, the Court warned the parties that in the event one wished to impeach a witness with an inconsistent statement, counsel should refer to such testimony as "another proceeding" or "other testimony" because the jury need not know that the case previously resulted in a mistrial. Despite these warnings, counsel directed a witness' attention to a transcript by questioning whether she had been asked "questions about some testimony you gave in a case called Maley v. Merck here on April 20." (Trial Tr. at 984.)

While I believe a Court order was ignored by Mr. Douglas, since I have found in the October 4, 2010 Opinion and

Order relating to Merck's motions under Fed. R. Civ. P. 50 and 59 that "its impact on the jury was de minimis" (Oct. 4, 2010 Op. & Order at 38), I will give Mr. Douglas a pass on this instance of misbehavior and not impose any sanction for what I consider to be a violation of a Court order.

As to Point 2, the date of the "Mucci Report," Merck argued that Mr. Douglas misstated the date of a report by FDA bio-statistician Anthony Mucci, by suggesting that it postdated the FDA review and approval of the Fracture Intervention Trial (FIT) study. At first, the Court agreed with Merck, but, upon closer review, it appears that Mr. Douglas' comments were not outside the bounds of proper advocacy because the Mucci Report did postdate the 1997 approval of Fosamax by the FDA for the prevention of osteoporosis.

Points 3 and 4 will be considered together since they both relate to the FDA. Point 3 is Mr. Douglas' argument in summation that the FDA had an "incestuous" relationship with pharmaceutical companies under which it makes the time limit to approve the drug within 10 to 12 months in exchange for funding "by the industry." (Trial Tr. at 1669.) Although the Court had ruled that FDA funding was not relevant (Trial Tr. at 919), the statement, albeit technically improper, was not enough to warrant sanctions. As Mr. Godosky points out, evidence about

-6-

FDA funding was not stricken from the record and thus could arguably be the subject of comment in summation. (Godosky Decl. ¶ 20.) The reference to an "incestuous" relationship between pharmaceutical companies and the FDA was impolite and hyperbolic, but by itself not sanctionable. Comparing the FDA's reviewing of Adverse Event Reports to the Government response to Hurricane Katrina was, to put it mildly, wild. During his summation, Mr. Douglas implored the jury:

> Look at that the summary. Thank God for them. They got to go to meetings. There's 40 people in the adverse event part of it to look at five hundred thousand adverse events reported a year.
> You know, God bless America. Love her. Fight for her. Die for her. We're not perfect. And it's no shock. To think that the FDA is not perfect? Oh, my goodness. Of course Merck will tell you they're perfect because they want you to think once we get approval, that's it.
> But I just have two words to say to you folks, when you think of our federal government sometimes. And say God bless America [sic]. Because here we can talk about it. And we can criticize so that we get better. Hurricane Katrina. Okay. That's your federal government in action at times.

(Trial Tr. at 1681:12-25.)

I will not sanction for this attack on the FDA, which after all, was not a defendant in the case. If this is an example of Mr. Douglas' "demonstrative or dramatic" (<u>supra</u> at 4) style, it does not impress this Court and he certainly should

-7-

refine and reform the style in the future.

Point 5 is the punitive damages issue.  On August 2, 2009, I issued a 42-page decision on Merck's Motion for Summary Judgment in the <u>Boles</u> case.  In pages 38-42 of the opinion, I unequivocally ruled punitive damages out of the case.  Any lawyer connected with the case, and certainly Mr. Douglas, as co-lead counsel in <u>Boles II</u>, was on notice as to this.  In spite of this ruling, he insidiously sought to inject it into the trial during his summation:

> Even, heck, Dr. de Papp told you, and I'm going to show you her [sic] transcript of her trial testimony that she gave a couple of days ago, even she said unwittingly, because you know, folks, one thing you can't run from and one thing you can't hide from at the end of the day is the truth, no matter how you want to pool data, no matter how you want to spin things to the FDA, no matter how you want to spend money on organizations to define criteria for treatment as low as possible so you can sell more pills, and that's what's going on here.  Let's give Fosamax to everyone in the world.  And I'm not surprised.  Is anybody here surprised that that's the position of Merck?  That it's a wonderful drug?  They sell it for profit.  They sell those pills, and it is clearly, especially what we learned yesterday, their goal, and I'm going to talk about that, their goal is to sell more pills.  To convince folks like Mrs. Boles, to convince folks that they should be frightened that unless you take this pill you're going to die, because 30 percent of people who have hip fractures end up dead.  We heard that from Dr. Bilezikian who came here to tell you all the scary details.  Whoo, everybody better get on Fosamax today.

(Trial Tr. at 1663:12-1664:7.)

He continued:

> She goes on Fosamax in 1997, folks, the drug that they want to sell to women who don't need it. That's what our case is about, selling drugs to women that don't need it. Sell more pills.

(Trial Tr. at 1674:7-10.)

What, I ask rhetorically, do the passages quoted above have to do with compensatory damages or pain and suffering?

And he went on to say:

> Dr. Marx has been living this like a crusader, in the best sense of that word, to
> get the word out against the powerful - - let me say that again - - against a company like Merck who is like the members of the Flat Earth Society. The Flat Earth Society, who doesn't want the world to know that the world is round. Do you know what the Flat Earth Society is? Why? Why? Because they want to sell more pills. If people find out the world is round, we'll be in a whole lot of trouble. We want to sell those pills to people who have osteopenia, 2.0 to 2.5.

(Trial Tr. at 1678:2-11.)

These arguments about selling "more pills" have no relationship to compensatory damages.

Continuing his verbal tirade:

> He goes out and tells people three hundred thousand fractures a year. Everybody in this room. He said that literally. Dr. Bilezikian. He said everyone in this room is at risk for hip fracture.
> Well, where can I get some Fosamax? Fosamax, Fosamax every day. Take one every day and keep

-9-

> your brittle bones away.
> I can just hear the theme song right now as he was saying - - and what's the motivation?  Sell more pills.  We want to sell to the people in the yellow.  So they fund these companies to say, at 1.5 to 2.5 these people need treatment.
> Look at this.  I love this part.  Intermediate risk.  Treatment is needed if other risk factors are present.  Fractures - - so if you're in this group like Mrs. Boles - - and how many - - what did they say 30 million people.  There are 30 million in this group.  That's a lot of pills, baby.  If we could just get into that market.
> So if you're in this T-score range and you have these things, he said, so - - and if you have these risk factors then treatment is so necessary. Fractures, family history, age, over 70, steroids, smoke - - it's like the whole world is in - - and just in case you're not in one of these, you weigh less than 127 pounds, well, that's rare.  Whew. They have this boilerplate, the catchall. Secondary causes.  Everybody should be on it. Let's give it out.  Fosamax.  Fosamax.  Every day.
> Do you see what's been taking place in this courtroom?  Because if you do, now you know what they're selling out there in the real world. What you saw and witnessed in this courtroom on their defense is exactly what they're doing out in the real world.  And you have the power to say no, don't buy it.  Because we learn, because the truth came out.

(Trial Tr. at 1683:6-1684:13.)

Mr. Douglas continued:

> Because they know that these people are at a risk for ONJ if they're on Fosamax.  Why are they even having the discussion?  And look how concerned they are.  It's reprehensible.  I don't really need to say a lot about that, it speaks for itself.  It's disgusting, disgusting.

(Trial Tr. at 1704:9-13.)

-10-

Characterizing Merck's conduct as "reprehensible" and "disgusting, disgusting" is not calling for anything but punitive damages.

And then the jury was told:

> When it comes to - - they like to say, oh, it's osteomyelitis that came before this. I want you to think about a lot of diseases have sequalae. You know, lung cancer, it's an injury and it causes other things to happen to you. Unfortunately, AIDS is a horrible thing, but it has all kinds of other symptoms that it produces. But they want you to think that the symptom is her disease and not the AIDS. It's the same analogy. She has osteomyelitis because of ONJ, not the other way around. And she's suffered enough. And we ask you to give her a little justice, to say something to Merck, that it stops here.
> . . .
> We have this courthouse because of things like this where you can set it right, and you have the power to say this in your verdict, to say to Merck, "No."

(Trial Tr. at 1710:2-1711:15.)

Saying "something to Merck" and "saying to Merck 'No'" plainly tell the jury to make an example of Merck.

During these impassioned arguments, there were two objections by the defense, one of which was overruled because the Court felt it could deal with the issue after summations. As to the other, I instructed the jury:

> THE COURT: I'll instruct the jury as to damages. You may finish your summation. Go ahead.

(Trial Tr. at 1711:18-19.)

-11-

Right after the summation concluded, I told Mr. Douglas, outside of the presence of the jury, that it was "clear that what was being said was an effort to inject punitive damages into the case which was clearly improper." (Trial Tr. at 1713:8-10.) Therefore, at Merck's request, I instructed the jury during the charge on the next morning:

> One final word about damages. During yesterday's summation, plaintiff's counsel urged, Mr. Douglas urged you to render a damages verdict that would "say something to Merck." In other words, plaintiff's counsel urged you to render a verdict that would punish Merck. Plaintiff's counsel's argument was inconsistent with the law. If you decide to render a damages verdict for plaintiff, that verdict should not be aimed at punishing Merck or "sending a message" to Merck or anybody else. The purpose of any damages you may render should be solely to compensate plaintiff for her injury.

(Trial Tr. at 1738:21-1739:5.)

The quoted passages from Mr. Douglas' summation demonstrated that he was arguing punitive damages and because of the Court's August 5, 2009 Opinion, he had ample notice that exemplary or punitive damages were not before the jury. Mr. Ross' argument that Mr. Douglas did not have "notice" that he was violating the rules does not hold water. (Sept. 9, 2010 Tr. at 4, 25.) He knew full well, as an experienced trial attorney, that he was way off limits. To urge otherwise, as Mr. Ross argues and Mr. Godosky seeks to do in his declaration, (Godosky

-12-

Decl. ¶ 25), does not conform to reality.  Mr. Douglas wanted the jury "to say something to Merck" and that meant to punish them.  With 50 trials to verdict under his belt, Mr. Douglas knew better.  To allow this type of argument and conduct in violation of the August 5, 2009 Opinion would be to countenance disorder in my Courtroom, undermine the rule of law, and reward misbehavior.  This was a trial, not a political campaign, and lawyers are supposed to follow rules.  He will be sanctioned for his conduct during summation.

       As to Point 6, "improperly injecting his own opinion concerning the evidence into his summation where Mr. Douglas on seven separate occasions said 'I think,'" at oral argument on September 9, 2010, I told Mr. Ross that no sanction would be imposed for this and I adhere to that ruling. (Sept. 9, 2010 Tr. at 10, 12.)

       As to Points 7 and 8, adverse event reports and the demonstrative "hypocrisy," arguably Mr. Douglas' conduct was barely within the limits of acceptable advocacy.  There is no sanction as to Points 7 and 8.

       As to Point 9 in the July 7, 2010 Order To Show Cause regarding "disparaging defense witnesses and generally acting rudely to defense counsel" and "using sarcasm, gestures, imitations, mockery, singing, derogatory tones, laughing," and

admittedly "fooling around" and "making fun," I suggest that much of what I have written in today's Opinion and Order on the Rule 50 and Rule 59 motions from pages 38 to 41 applies here.

To put it kindly, Mr. Douglas' style of advocacy was aggressive and boisterous.  As Merck has suggested, it was vaudeville.  Although a court transcript may not be able to fully capture the real tone in a written record, Mr. Douglas' periodically outlandish behavior at trial remains fresh in my mind.

The rude treatment of defense witness began with the cross-examination of Dr. Robert Glickman.  He was Merck's retained expert on the issue of specific causation.  Mr. Douglas provoked the Doctor with sarcasm, mockery, and condescending questions.  For example, after Dr. Glickman explained why he did not understand the pending question posed by counsel, Mr. Douglas responded: "Would you like a glass of water?  Are you okay?  Slow down.  Not a trick question.  I just want to ask you whether you did a report or not.  Something wrong with that?" (Trial Tr. at 1360:18-20.)  Although in that instance and others, counsel's words during cross-examination could be read as polite from the record, they were conveyed with scorn and derision.  Mr. Douglas later accused Dr. Glickman of being defensive -- an observation that was correct in light of the offensive manner in which

counsel was conducting himself, but nonetheless an accusation that was improper to make before the jury. Dr. Glickman was not exactly forthcoming on cross-examination, but experienced trial lawyers know that there are a multitude of proper methods that can be used to control a difficult witness on cross-examination that are not offensive and rude.

The Court admonished counsel out of the presence of the jury for the manner in which he cross-examined Dr. Glickman. The Court warned counsel that "[t]his isn't Law and Order, and in my generation, it's not Perry Mason" so "put [on] your questions . . . stop the sarcasm" and "don't be a wise guy." (Trial Tr. at 1394:3-12.) The Court also called Mr. O'Brien to the sidebar on another occasion and told him off the record that Mr. Douglas should stop acting unprofessionally.

The warnings apparently fell on deaf ears. Counsel's theatrics were only amplified in his closing argument as pointed out above. Mr. Douglas delivered his argument in an agitated tone, scuttling about the well of the courtroom, oddly gesturing, singing, and laughing, a style that may best be described as manic. He was admittedly "fooling around with it" and "making fun." (Trial Tr. at 1672.) The Court is mindful that wit and sarcasm are often useful tools for trial lawyers, but Mr. Douglas' use of such methods crossed the line between zealous

-15-

advocacy and inappropriate behavior.

For example, Mr. Douglas returned to his favorite target, Dr. Glickman, the so-called "guy who knows nothing about bisphosphonate-related ONJ." (Trial Tr. at 1672:16-17.)  Rather than solely focusing on the substance of the expert's testimony, Mr. Douglas made fun of the manner in which it was conveyed, referring to Dr. Glickman's use of slides during direct testimony as "a dog and pony show" in which he "read[] from the board" using "his fancy flashcards," and telling the jury that he would "bet dollars to doughnuts that Dr. Glickman didn't read those medical records." (Trial Tr. at 1671-72.)  Counsel also mocked the testimony of Dr. Anne de Papp, a Merck doctor, who during direct examination commented as an aside that she recently had observed an elderly woman on the local commuter train who she believed suffered from severe osteoporosis based on the woman's hunched posture.  Mr. Douglas felt it necessary to attack that insignificant background testimony in summation:  "But she can diagnose fractures riding the subway.  Is it the A train?  Or is it the number 4 train?  Is it going uptown?  Or is it going downtown?  Is it in Russia?  Do you have to have your coat on?  Don't you have to take your coat off?" (Trial Tr. at 1688:21-25.)

Mr. Douglas also commented on opposing counsel's

-16-

initial failure to address him by name, stating: "I appreciate Mr. Strain eventually started to refer to me by name and I appreciate that, as opposed to 'the lawyer,' not to be confused with 'the chair' or this table, but, you know, that's just stuff, techniques that lawyers use, you know, dehumanize the other side, easier to turn that, whatever it is, it's his business, whatever."  (Trial Tr. at 1677:16-21.)

In spite of the conduct described in Point 9 here, there will be no sanction on these issues.

## Conclusion

Mr. Douglas is sanctioned and directed to pay the sum of $2,500 to the Clerk of the United States District Court for the Southern District of New York for his non-compliance with my ruling on the punitive damages issue as discussed in Point 5 above (supra at 8-13).  This relatively light sanction takes into account the fourteen letters submitted by lawyers on his behalf, several of whom were Mr. Douglas' adversaries in prior litigation.  It is sufficient, but no greater than necessary, to reflect the seriousness of his conduct and it will promote his respect for the legal process.

The $2,500 is to be delivered to the Clerk's Office by the close of business October 18, 2010. There will be no referral to the Grievance Committee. As Mr. Ross pointed out, the Sword of Damocles has been over Mr. Douglas' head long enough. (Sept. 9, 2010 Tr. at 24.)

**SO ORDERED.**

Dated:  New York, New York
        October 4, 2010

*/s/ John F. Keenan*
JOHN F. KEENAN
United States District Judge